UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MIGUEL DORTA and NATHAN FUCHS, ) | Civil Action No. |
| ) | |
| individually and on behalf of all ) | |
| others similarly situated ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| SPECIALTYCARE, INC. ) | |
| ) | |
| ) | |
| Defendant. ) | |

## CLASS ACTION COMPLAINT

1.      Defendant SpecialtyCare is one of the nation's leading providers of outsourced health and operating services. The services it provides include intraoperative neuromonitoring, which involves observing patients during surgery and alerting doctors to signs of abnormal brain and nerve functioning.

2.      This work is performed by technicians called surgical neurophysiologists.

3.      SpecialtyCare trains its incoming surgical neurophysiologists in a program it calls "SpecialtyCare University," although SpecialtyCare University is a job-training program, not an accredited school. The training lasts for a year and includes a week of in-person coursework along with ongoing online coursework that covers workplace procedures along with basic lessons in topics like anatomy and physiology.

4.      At the same time that surgical neurophysiologists receive training from SpecialtyCare University, they are working full-time in the operating room as surgical

1

neurophysiologists, a grueling job that often requires them to show up on short notice to surgeries that can last 14 hours or more.

5.     In exchange for the training, SpecialtyCare surgical neurophysiologists have to sign a Training Repayment Agreement Provision ("TRAP") promising to "reimburse" SpecialtyCare for the cost of their training if they leave their jobs within three years.

6.     But while the training lasts for only a year, the so-called reimbursement amount continues to increase over the three-year TRAP period. While surgical neurophysiologists who leave SpecialtyCare within six months of starting will owe the company $15,000 for the purported cost of training, that amount increases to $20,000 by the end of the first year—and then, inexplicably, keeps growing, even after training is complete. A surgical neurophysiologist who leaves SpecialtyCare after between one and two years will owe the company $25,000. If they leave after between two and three years, they will owe the company $30,000.

7.     This ballooning debt lays bare the fiction that the TRAP amount is a true reimbursement to SpecialtyCare for the cost of worker training, exposing it for what it really is: An attempt to keep workers trapped in underpaid, taxing jobs where leaving would mean paying back more than half of a years' salary.

8.     Under the Fair Labor Standards Act, employers cannot charge employees for costs that benefit the employer when doing so would bring wages below the minimum wage or result in a failure to pay the minimum wage free and clear. SpecialtyCare's TRAP violates this principle by making employees pay an arbitrary and inflated amount to reimburse SpecialtyCare for the purported cost of training.

9.     SpecialtyCare may argue that the training is primarily for employees' benefit, much like a vocational school would be. But if that is the case, then the ballooning debt is a type of

finance charge—in essence, interest that accrues at a rate of nearly 30% annually even after the training is complete. SpecialtyCare has not provided its workers with any of the disclosures or protections required for such loans under federal lending laws.

10.     Whatever you call it, SpecialtyCare's TRAP violates the law. SpecialtyCare is either charging its workers for its own business costs, or it is engaging in unauthorized student lending. Either way, it is undermining the normal functioning of the job market to keep workers trapped in underpaid and demanding jobs by threatening them with crushing debt if they try to leave for any reason.

11.     This lawsuit seeks to invalidate SpecialtyCare's TRAP, to make whole those who have paid SpecialtyCare to be able to leave their jobs, and to recover for SpecialtyCare workers the wages they should have earned in a properly functioning job market free from SpecialtyCare's manipulation.

## PARTIES

12.     SpecialtyCare is a privately-held corporation owned by private equity firm Morgan Stanley Infrastructure Partners and located in Brentwood, Tennessee. SpecialtyCare's principal place of business is in Brentwood, Tennessee.

13.     Plaintiff Nathan Fuchs was employed by SpecialtyCare from approximately November 2020 to February 2022 in Atlanta, Georgia.

14.     Plaintiff Miguel Dorta was employed by SpecialtyCare from approximately August 2022 to December 2022 in the Miami, Florida area.

15.     At all times relevant to this action, SpecialtyCare was an enterprise engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. § 203(r)–(s).

3

16.     SpecialtyCare had gross sales made or business done in excess of $500,000 annually for each of the years from 2020 through the present.

17.     Throughout their employment, SpecialtyCare was an "employer" of Fuchs and Dorta as defined by the FLSA.

18.     Throughout their employment, Fuchs and Dorta were non-exempt "employees" of SpecialtyCare as defined by the FLSA.

19.     Throughout their employment, SpecialtyCare "employed" Fuchs and Dorta within the meaning of the FLSA.

## JURISDICTION & VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. Plaintiffs' state law claims are so closely related to their federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

21.     This Court has personal jurisdiction over the parties because Defendant transacts business in and is headquartered in this District, and some of the acts giving rise to the claims alleged in this Complaint occurred in this District.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to this claim arose from transactions conducted in this District, and because Defendant resides in this District.

## STATEMENT OF FACTS

23.     SpecialtyCare is one of the country's largest providers of clinical services to hospital operating rooms. As of 2021, it provided services to over 1,200 client hospitals in 46 states.

4

24.     The services SpecialtyCare provides include intraoperative neurophysiological monitoring ("IONM"). IONM involves tests that read the nervous system during certain surgeries in order to help identify early signs of injury. IONM is performed by surgical neurophysiologists ("SNs"), whose job is to monitor the test results and alert doctors to signs of abnormal functioning.

25.     SpecialtyCare employs SNs at locations all across the country, providing services to over 450 hospitals and monitoring over 100,000 cases annually.

26.     SNs are employees of SpecialtyCare, not the hospitals where they work.

**<u>SN Education</u>**

27.     There are no state or federal licensing requirements to be an SN.

28.     The American Board of Registration of Electroencephalographic and Evoked Potential Technologists ("ABRET") provides a Certification in Neurophysiologic Intraoperative Monitoring ("CNIM") for SNs. This certification is colloquially known as a board certification.

29.     CNIM candidates need a diploma from a school accredited by the Commission on Accreditation of Allied Health Education Programs, an existing board certification in EEG or EP, a bachelor's degree and 30 education hours from a neurophysiology professional organization, or a certificate of completion from an ABRET recognized program in order to be eligible to take the board exam. In addition, they need documentation of at least 100 cases as well as current CPR and Basic Life Support certification.

30.     Some SpecialtyCare SN1s enter the training program with the educational requirement already met. Others qualify for the educational requirement through receiving SpecialtyCare's certificate of completion.

5

31.     Some hospitals require SNs to be board-certified to be eligible to work in them, but some do not.

**IONM Training Program**

32.     Entry-level SNs ("SN1s") join SpecialtyCare through its IONM training program, which SpecialtyCare advertises as "full-time, salaried employment coupled with a structured and progressive one-year training program that features a combination of classroom work, laboratory practicums, online instruction and practical training in the operating room."

33.     The IONM training program is called "SpecialtyCare University."

34.     SpecialtyCare University is recognized as an IONM training program by ABRET.

35.     However, SpecialtyCare University is not accredited by any accrediting body recognized by either the Council for Higher Education Accreditation or the United States Department of Education, which are the two main accrediting organizations in the country. Accreditation signifies that an institution meets a certain standard of academic quality.

36.     The SpecialtyCare University training program is completed over approximately the course of a year, during which time SNs also engage in paid work.

37.     The training program is led by director Julie Trott, who also serves as the direct supervisor of all incoming IONM trainees.

38.     According to SpecialtyCare's website, training is divided into three phases. As SN1s move through the phases of training, they work more and more independently. In addition, they receive modest salary increases.

39.     Phase one of training begins with two weeks of full-time onboarding and basic coursework. Coursework during the first two weeks of training covers topics such as employee

6

onboarding, surgical etiquette, and basic lessons in anatomy, electronics, anesthesia, and various neuromonitoring technologies, including SSEPs, MEPs, sEMG, tEMG, and EEGs.

40.     For the first week of training, all entry-level SN1s attend daily classes via Zoom for up to eight hours a day.

41.     For the second week, SN1s generally travel to the SpecialtyCare training facility in Nashville, Tennessee. During that week, SN1s take additional courses, and also receive hands-on training in SpecialtyCare's simulated operating room.

42.     In the simulated operating room, SN1s are introduced to surgical equipment and role-play interactions between SNs and the rest of the surgical team.

43.     During the COVID-19 pandemic, some cohorts of trainees did not travel to Nashville. Instead, the entire first two weeks of training all took place online.

44.     After the first two weeks of training, SN1s return to their hometowns across the country and begin working in the operating room.

45.     Each SN1 is assigned to a mentor, or "preceptor," who is a more senior and experienced surgical neurophysiologist. Preceptors are meant to be assigned to the same cases as more junior SN1s and provide hands-on training and support them as they become more comfortable and experienced in the operating room.

46.     In practice, due to staffing limitations, SN1s are not always assigned to cases with their preceptors. Even when they do work with a preceptor, there is significant variation in how much training and support different preceptors provide.

47.     In addition to working in the operating room, throughout Phase One SN1s continue to take online classes that are scheduled approximately twice a week for up to four to five hours

7

each day. Class topics that are covered in online classes include anatomy, writing interpretive reports, and clinical practice guidelines, among others.

48.     SN1s take quizzes to track their progress on an ongoing basis. In addition, they receive assignments such as case presentations, where they are required to make a PowerPoint presentation describing a case they have worked on in the operating room.

49.     Approximately three to five months after beginning work, SN1s take an initial clinical competency assessment. They are required to achieve a passing score on this assessment in order to continue working as an SN for SpecialtyCare. SN1s are given two chances to pass this test.

50.     If they do not pass, they are fired, and will owe SpecialtyCare $15,000 for their training.

51.     Once SN1s have passed the initial clinical competency assessment, they move on to Phase Two of training. Once SN1s are in Phase Two, they largely work by themselves and without supervision.

52.     During Phase Two, SN1s are still required to attend online lectures via Zoom, but these lectures meet only approximately once a month. SN1s also take quizzes every several weeks, and are given assignments like writing a report on a scientific article.

53.     At the end of Phase Two, which according to SpecialtyCare's website is approximately six months after taking the initial clinical competency assessment, SN1s are required to take a second competency assessment.

54.     They are required to achieve a passing score on this assessment in order to move on to Phase Three and continue working as an SN for SpecialtyCare.

55.     If they do not pass, they are fired, and will owe SpecialtyCare between $15,000 and $20,000 for their training, depending on the timing.

56.     In Phase Three of the training, SN1s no longer have coursework.

57.     However, in order to complete the training program, they are required to complete a "thesis" project, which involves preparing a presentation that is given to an audience including their manager, their educational supervisor, and other regional leadership at SpecialtyCare.

58.     Possible topics include presenting on academic sources or data that SpecialtyCare has collected from its IONM work.

59.     Scheduling the presentation can be difficult as a result of the people who are required to be present. This can delay "graduation," which is required before SN1s can be promoted to SN2s and receive a corresponding pay raise.

60.     SNs who have completed the IONM Training Program are promoted to SN2s within SpecialtyCare.

61.     Once SNs have completed the training program, they are formally eligible to take the CNIM exam through the path that requires a certificate of completion from an ABRET-recognized program. However, some SNs take the exam and receive their certification before competing training.

**The TRAP**

62.     SpecialtyCare requires incoming SN1s in the IONM Training Program to sign an "Associate Repayment Agreement," or Training Repayment Agreement Provision ("TRAP") alongside their offer letter.

63.     The TRAP requires SN1s to "reimburse" SpecialtyCare for "the training, financial assistance, and/or payments provided to Associate" as set forth on an attached schedule.

9

64.     The Surgical Neurophysiology Training Schedule sets forth the following repayment scheme:

> a. If a trainee resigns within 6 months of hire, he or she owes SpecialtyCare $15,000.
>
> b. If a trainee resigns between 6 and 12 months of hire, he or she owes SpecialtyCare $20,000.
>
> c. If a trainee resigns between 12 and 24 months of hire, he or she owes SpecialtyCare $25,000.
>
> d. If a trainee resigns between 24 and 36 months of hire, he or she owes SpecialtyCare $30,000.

65.     The TRAP debt is only forgiven after three years of employment with SpecialtyCare.

66.     The Surgical Neurophysiology Training Schedule purports to reimburse SpecialtyCare for "training expenses."

67.     The TRAP allows SpecialtyCare to deduct any repayment obligation from SNs' paychecks "to the full extent permitted by applicable law."

68.     If an SN does not pay SpecialtyCare the full TRAP amount upon termination, or negotiate an agreed-upon repayment plan, SpecialtyCare reserves the right to send the debt to collections or file a legal action for recovery.

69.     The TRAP includes a Tennessee choice of law provision.

**Working Conditions**

70.     Starting in their third week of employment, SN1s begin to work in operating rooms providing intraoperative neuromonitoring during surgeries.

71.     SN1s are assigned cases at different hospitals in the area where they work. Generally, these hospitals are in the SN1's home region, within approximately an hour or an hour and a half of each other. However, sometimes SN1s will receive assignments at hospitals that are several hours' drive away.

72.     SN1s receive their assignment the evening before a surgery, at which point they find out when and where they are required to report for work the next day.

73.     Depending on the complexity, surgeries can last as long as fourteen to sixteen hours, with limited ability to take breaks or even use the bathroom.

74.     The result of this system is an unpredictable and often grueling schedule. For example, SNs may receive an assignment at 5 pm to attend a surgery that starts at 7 am the following morning in a city a four-hour drive away. This requires SNs to make a long drive in the middle of the night with little sleep in order to be at the surgery when it begins.

75.     SN salaries at SpecialtyCare are well under market. Starting salaries range from $35,000 to $40,000. SNs receive one raise to approximately $45,000 after they complete Phase 1 of training, and another raise to approximately $65,000 after they complete Phase 3 of training. After this raise, they are not eligible for another raise throughout the remainder of the three-year TRAP period.

76.     These working conditions are grueling and burnout is common. Some training cohorts see as much as 75% attrition within a few years of starting work, in spite of the large TRAP debt that looms over those who leave within three years of beginning training.

**Plaintiff Miguel Dorta's Experience**

77.     Plaintiff Miguel Dorta was hired as a surgical neurophysiologist with SpecialtyCare in July 2022 to work in the Fort Lauderdale/Miami area in Florida.

11

78.    Prior to working at SpecialtyCare, Dorta worked as a surgical assistant and a medical assistant.

79.    Upon hire, Dorta signed several documents with SpecialtyCare, including the TRAP and a non-compete and non-disclosure agreement.

80.    Dorta was hired as a non-exempt employee with a starting annual salary of $40,000 per year, or $19.23 an hour based on a standard 40-hour workweek.

81.    Dorta began training on August 5, 2022 as part of SpecialtyCare's August 2022 SN training class.

82.    Dorta's evaluation after the end of the initial two-week training period was positive:

Miguel is a quick learner with a firm foundation in healthcare. He is somewhat quiet, but he can also speak with confidence and projection when needed. He is very polite and respectful, and has shown great strides in applying the concepts in class this week. Miguel will be a great addition to the Fort Lauderdale/Miami team!

83.    On August 26, 2022, Dorta began to work as an SN1 in the operating room under the supervision of more senior SNs, including his preceptor, Jarrod Wilner.

84.    Dorta received assignments at hospitals around the Miami/Fort Lauderdale area, including the Cleveland Clinic Weston, HCA Aventura Hospital, and the Miami Surgical Center.

85.    Throughout the next several months, Dorta worked in the operating room as an SN1.

86.    In addition to his work in the operating room, Dorta continued to attend classes and take quizzes for his training with SpecialtyCare.

87.    In November 2022, Dorta's scheduling supervisor had a family issue and took time off. During that time, Dorta was not assigned to a backup supervisor, and did not receive any case assignments. Dorta understood based on information he had been provided during orientation that

12

he did not need to come in to work on days when he did not receive any assignments, so did not come into work, despite being ready and willing.

88. However, when Dorta's supervisor returned to work, the supervisor told Dorta that he should have contacted SpecialtyCare to get his assignments. Dorta was reported for taking time off without permission, and on December 4, 2022, received a corrective action for absenteeism.

89. In December 2022, Dorta told Trott that he was having difficulty with Wilner's supervision, which he believed was frustrating his development. Dorta requested to be transferred to a different instructor.

90. Trott responded declining Dorta's request and suggesting that he speak with Wilner directly.

91. On December 9, 2022, Trott informed Dorta that he had not passed his Phase One training exam, and would have to retake the test. She also informed him that only one retake of the test would be allowed.

92. If he did not pass the test on his second try, Dorta would be fired, and would be required to pay SpecialtyCare $15,000 for the purported cost of his training.

93. Dorta requested one week of unpaid leave to study for the retake. His request was declined.

94. Because he was concerned about failing the test, Dorta took time off to study. As a result, he was terminated.

95. On the conference call in which he was terminated, a SpecialtyCare employee named Sherrie Nix told him that he owed SpecialtyCare money as a result of the training and would need to pay them back.

13

96. Dorta's last day of employment with SpecialtyCare was December 15, 2022. On that date, SpecialtyCare sent him a letter requesting repayment of $15,000 for the training he received.

97. Dorta did not respond to the letter.

98. Dorta has not received further follow-up communications from SpecialtyCare about the TRAP debt. However, he continues to be anxious about the very real threat that SpecialtyCare will attempt to collect on the debt.

99. Dorta cannot afford to pay $15,000, and if forced to pay the debt, believes he would have to file for bankruptcy.

**Plaintiff Nathan Fuchs' Experience**

100. Plaintiff Nathan Fuchs was hired as a surgical neurophysiologist with SpecialtyCare in September 2020 to work in Atlanta, Georgia.

101. Prior to working for SpecialtyCare, Fuchs had worked as a neurodiagnostic technician. As a result, when he started working at SpecialtyCare, he was already certified by ABRET in Long Term Monitoring, as a Registered EEG Technician, and as a Registered EPT Technician.

102. Upon hire, Fuchs signed several documents with SpecialtyCare, including the TRAP and a non-compete and non-disclosure agreement.

103. Fuchs was hired as a non-exempt employee with a starting annual salary was $35,000 per year, or between $16 and $17 an hour.

104. Fuchs began training on or around November 9, 2020 as part of SpecialtyCare's November 2020 SN1 training class.

105. Fuchs's classes all took place online via Zoom due to the COVID-19 pandemic.

14

106.     After the initial two weeks of online training, Fuchs began to work as an SN1 in the operating room. Because his training was all online, he did not travel to Nashville or practice in SpecialtyCare's simulated operating room before working with real-life patients.

107.     Fuchs was assigned a preceptor named Dave Cabrera. However, during his first surgery, Cabrera walked out at a key moment, leaving Fuchs by himself. After that first surgery, Fuchs was rarely assigned to work alongside Cabrera.

108.     Instead, Fuchs worked with a variety of other SNs, whose patience and level of supervision varied dramatically.

109.     Fuchs received assignments at hospitals around the Atlanta, Georgia area.

110.     In addition, SpecialtyCare sometimes assigned Fuchs to hospitals further afield, in Nashville, Tennessee; Savannah, Georgia; and Augusta, Georgia. These hospitals were up to a four-hour drive from Fuchs's home, requiring him to travel overnight in order to be present at surgeries scheduled first thing in the morning.

111.     In addition to his work in the operating room, Fuchs continued to attend classes and take quizzes for his training with SpecialtyCare. However, Fuchs was sometimes scheduled for shifts that conflicted with class times, forcing him to miss class.

112.     In February 2021, Fuchs took and passed his Phase One training exam, and SpecialtyCare determined that he was able to work entirely unsupervised. After this point, he was generally the only SN in the operating room. In fact, on several occasions, Fuchs was required to cover two cases at once, which required him to run back and forth between patient rooms.

113.     Fuchs took the ABRET CNIM exam before his SpecialtyCare University coursework was completed. He did not need to complete the coursework in order to take the exam, which he passed.

114.    In July 2021, Fuchs's husband, who was a more senior SN at SpecialtyCare, resigned. Following his resignation, SpecialtyCare began to retaliate against Fuchs by scheduling him for inconvenient shifts, or by telling him he was scheduled to work at one hospital and then requiring him to drive across town to another hospital.

115.    For several months, Fuchs attempted to keep working at SpecialtyCare because he had been working towards the SN job for a long time, and he was scared that SpecialtyCare would ensure that he was unable to get another job in the industry.

116.    In February 2022, Fuchs resigned from SpecialtyCare after securing another job.

117.    On February 14, 2022, an HR representative named Shandus Parish e-mailed Fuchs attaching an Acceptance of Resignation letter and informing him that he owed $25,000 for his SN training.

118.    Fuchs responded with a detailed letter explaining why he did not believe that $25,000 was a reasonable or appropriate amount for the training he had received.

119.    On May 23, 2022, Parish sent Fuchs what she described as a "Final Notice" requesting repayment.

120.    Fuchs responded declining to pay, saying he did not believe the training was adequate and that he believed its primary purpose was to suppress his wages in a competitive market.

121.    Parish replied that SpecialtyCare would be sending Fuchs's account to collections on June 8, 2022 if he had not paid by then.

122.    Fuchs's account was sent to debt collector TekCollect, which began trying to collect the debt from him.

16

123. In 2023, Fuchs hired a lawyer, who negotiated with SpecialtyCare to accept $15,000 for repayment of the debt.

124. In exchange for the $15,000 payment, SpecialtyCare signed a general release that released Fuchs from any claims that SpecialtyCare could bring against him related to his employment, including any claims related to his repayment obligation. The release was signed by Angela J. Davis, VP of Human Resources, on April 18, 2023.

125. SpecialtyCare did not require Fuchs to sign any corresponding release.

## CLASS ACTION ALLEGATIONS

126. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

127. Plaintiffs assert claims on behalf of and seek to represent a Class of all SNs who are or were subject to SpecialtyCare's Training Repayment Agreement Provision within the statute of limitations.

128. Plaintiffs reserve the right to amend and refine the class definition above or add classes and/or subclasses as litigation progresses.

129. **Numerosity**: The Class is so numerous that joinder of all class members is impracticable. Upon information and belief, SpecialtyCare has employed over 100 SNs in its IONM training program during the relevant period across the United States who were subjected to its TRAP. Although the precise number of putative Class members is currently unknown, these members can be easily identified based on Defendant's records.

130. **Commonality**: Common questions of law and fact exist as to all members of all Classes and predominate over any questions solely affecting individual members, including but not limited to:

a. whether the training and TRAP debt is primarily for SpecialtyCare's benefit;

b. whether SpecialtyCare is engaged in consumer lending;

c. whether SpecialtyCare violated the Truth in Lending Act by failing to make required disclosures;

d. whether SpecialtyCare engaged in usury;

e. whether SpecialtyCare's TRAP operates as an invalid liquidated damages provision; and

f. the proper measure of damages and/or other forms of relief.

131. These common questions arise, in part, because of the uniform circumstances under which Plaintiffs and the Class worked. These include the form contracts and workplace policies that resulted in a standard environment and set of employer-mandated conditions that employees were forced to abide by under the same threat of being sued.

132. **Typicality**: Plaintiffs' claims are typical of the members of the Class because Plaintiffs were subject to and harmed by SpecialtyCare's standard TRAP contract within the statute of limitations, and SpecialtyCare treated them consistently with other class members in accordance with its standard policies and procedures.

133. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the prosecution of this action and have retained counsel with extensive experience in class actions, including class actions involving TRAPs. There are no conflicts between Plaintiffs or Plaintiffs' counsel and the Class Plaintiffs seek to represent.

134. **Predominance and Superiority**: Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any

18

questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. SpecialtyCare uses a contract that is uniform as to all relevant terms, and promulgates uniform policies and practices that result in common violations of law. Declaratory, equitable, and injunctive relief are appropriate with respect to Plaintiffs and members of the Class as a whole. Joinder of all members of the Class is impracticable, and class certification will promote efficiency by eliminating the complication and expense of duplicative litigation that might overwhelm the courts and result in inconsistent judgments concerning Defendant's practices. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## COLLECTIVE ACTION ALLEGATIONS

135.    Pursuant to the collective action provision of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), Plaintiffs seek to represent an FLSA Collective consisting of all SNs employed by Defendant who are or were subject to the TRAP and file a consent form to join this action.

136.    The proposed FLSA Collective members are similarly situated in that they have been subject to uniform policies and practices by Defendant that violated the FLSA, including Defendant's TRAP and post-employment collections conduct.

## COUNT I (in the alternative to Count III): FAIR LABOR STANDARDS ACT (Illegal Kickback)

## 29 U.S.C. § 216

### (Plaintiffs on behalf of themselves and the Collective against Defendant)

137.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

138.    Defendant was Plaintiffs' employer pursuant to the Fair Labor Standards Act.

139.    Plaintiffs were employees pursuant to the Fair Labor Standards Act.

19

140.    If the training and TRAP debt were primarily for Defendant's benefit, repayment of alleged training costs under the TRAP that Defendant has imposed on Plaintiffs and others similarly situated is an illegal kickback of wages to Defendant.

141.    Requiring employees to kick back these training costs to Defendant takes their wages below minimum wage in their final week of work, resulting in a minimum wage violation for that week.

142.    Plaintiffs were not paid at least the minimum wage for all hours worked in her final week of work, because they were required to kick back those wages to Defendants under the TRAP.

143.    Defendant's actions constitute willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

144.    Plaintiffs and others similarly situated are entitled to recover unpaid minimum wages plus an additional equal amount in liquidated damages and declaratory relief that the purported costs of the debt are not reimbursable pursuant to the FLSA, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

**COUNT II (in the alternative to Count III): FAIR LABOR STANDARDS ACT (Wages Not Paid Free and Clear)**

**29 U.S.C. § 216**

**(Plaintiffs on behalf of themselves and the Collective against Defendant)**

145.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

146.    Defendant was Plaintiffs' employer pursuant to the Fair Labor Standards Act.

147.    Plaintiffs were employees pursuant to the Fair Labor Standards Act.

148.    If the training and TRAP debt were primarily for Defendant's benefit, Defendant violated 29 U.S.C. § 206 by unlawfully requiring Plaintiffs and others similarly situated to repay

20

between $15,000 and $30,000 of their earned and taxed wages to Defendant once their employment with Defendant ended (including under some circumstances if Defendant chose to fire them).

149.    Rather than paying Plaintiffs and other similarly situated employees their wages "free and clear," Defendant maintained and enforced a policy under which the wages paid to employees during every pay period were paid conditionally, subject to the requirement that they not leave their jobs. If they did leave their jobs, they would have to repay all of the wages earned during the pending pay period, plus tens of thousands of additional dollars.

150.    By requiring Plaintiffs and other similarly situated employees to return their wages to Defendant, Defendant failed to pay wages "finally and unconditionally," as required by the FLSA.

151.    Because Defendant failed to pay wages "finally and unconditionally," Defendant cannot be deemed to have met the wage requirements of the FLSA, which includes the requirement to pay no less than the federal minimum wage for each hour worked.

152.    Defendant's actions constitute willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

153.    Plaintiffs and others similarly situated are entitled to recover all unpaid minimum wages plus an additional equal amount in liquidated damages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## COUNT III (in the alternative to Counts I and II): TRUTH IN LENDING ACT

## 15 U.S.C. § 1601, *et seq.*

### (Plaintiffs on behalf of themselves and the Class against Defendant)

154.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

155.    The training and TRAP debt were primarily for Plaintiffs' benefit, Defendant is a creditor within the meaning of 15 U.S.C. § 1602(g) because Defendant extends consumer credit payable to Defendant at least 25 times a year in the form of the reimbursement obligation loan included in the Associate Repayment Agreement for which the payment of a finance charge is required.

156.    If the training and TRAP debt were primarily for Plaintiffs' benefit, Plaintiffs are consumers within the meaning of 15 U.S.C. § 1602(i) because Plaintiffs are natural persons who was engaged in the training for which Defendant is imposing the reimbursement obligation.

157.    The Surgical Neurophysiology Training Schedule addendum to the TRAP states that the initial loan obligation is $15,000.

158.    After six months of employment and up to twelve months of employment, the loan obligation increases to $20,000.

159.    After twelve months of employment and up to twenty-four months of employment, the loan obligation increases to $25,000.

160.    After twenty-four months of employment and up to thirty-six months of employment, the loan obligation increases to $30,000.

161.    In other words, the balance on the loan continues to increase for approximately two years after the end of the training that the loan is purportedly for.

162.    The subsequent increase in the debt imposed upon Plaintiff based upon the length of employment is imposed by the Defendant as an incident to extension of the initial loan obligation.

163. The increase in the debt imposed upon Plaintiff based upon the length of employment is interest on the initial loan obligation and a "finance charge" pursuant to 15 U.S.C. § 1605.

164. The disclosure statement issued in conjunction with this consumer credit transaction violated the requirements of Truth in Lending and Regulation Z in the following and other respects:

165. a. By failing to provide the required disclosures prior to consummation of the transaction in violation of 15 U.S.C. § 1638(b) and Regulation Z § 226.17(b).

166. b. By failing to make required disclosures, including the annual percentage rate and finance charge, clearly and conspicuously in writing in violation of 15 U.S.C. § 1632(a) and Regulation Z § 226.17(a).

167. By reason of the aforesaid violations of the Act and Regulation Z, defendant is liable to plaintiff in the amount of the lesser of $1,000,000 or 1 percent of the net worth of Defendant, actual damages to be established at trial, and attorney fees and costs in accordance with 15 U.S.C. § 1640.

## COUNT IV: AGREEMENT IN RESTRAINT OF TRADE

### Unlawful Restraint of Trade

### (Plaintiffs on behalf of themselves and the Class against Defendant)

168. Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

169. Agreements in restraint of trade are unenforceable unless they are reasonable.

170. Reasonableness is assessed by looking at the consideration supporting the agreements, the threatened danger to the employer in the absence of such an agreement, the economic hardship imposed on the employee by the agreement, and the public interest.

23

171.     A clear purpose and effect of the TRAP is to limit the mobility of SpecialtyCare workers and prevent them from seeking out other job opportunities.

172.     The TRAP punishes workers for leaving their job without limitation as to the time, geographical area, or scope of activity that it restricts. That's because it applies no matter where SpecialtyCare employees go following their employment with SpecialtyCare, or when, and regardless of what their subsequent employment entails, or whether they are subsequently employed at all.

173.     The TRAP imposes a severe economic penalty on departing employees that does not protect any legitimate competitive interest of SpecialtyCare. It injures workers by subjecting them to debts that can exceed half of their yearly salary, and injures the public by limiting the choice and mobility of skilled employees.

174.     Plaintiffs and the Class seek a declaration that the SpecialtyCare TRAP is an unlawful restraint of trade under Tennessee law.

175.     In addition, Plaintiff and the Class seek an injunction: (a) prohibiting SpecialtyCare from taking any further actions to collect on or enforce its TRAP; (b) prohibiting SpecialtyCare from referring any further cases to a collections agency; (c) prohibiting SpecialtyCare from reporting this invalid debt to any collections agencies; and (d) requiring SpecialtyCare to take appropriate steps to repair the damage done to the credit ratings of the Class members, such as a goodwill deletion agreement.

## COUNT IV: UNENFORCEABLE PENALTY

### Unlawful Liquidated Damages Provision

### (Plaintiffs on behalf of themselves and the Class against Defendant)

176.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

24

177. Liquidated damages clauses for breach of contract are reasonable if (1) if the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages is a reasonable forecast of just compensation. Liquidated damages clauses that do not meet both of these requirements are considered to be unenforceable penalties.

178. The TRAP is an unenforceable penalty. The harm caused by SNs who leave SpecialtyCare before the end of the three-year TRAP term is not incapable or difficult of estimation, and the amount of liquidated damages SpecialtyCare charges departing SNs is not a reasonable forecast of just compensation.

179. Plaintiffs and the Class have been harmed by this unlawful penalty, as set forth above.

180. They seek a declaration that the TRAP is unlawful and unenforceable against them, as well as costs and reasonable and necessary attorney's fees.

## PRAYER FOR RELIEF

181. Plaintiffs respectfully request that the Court:

a.    Certify the case as a class action on behalf of the proposed class;

b.    Designate Plaintiffs as class representatives;

c.    Designate Plaintiffs' counsel of record as class counsel;

d.    Certify the case as a collective action on behalf of the proposed collective;

e.    Declare that Defendant's conduct is illegal under the various statutes cited here;

f.    Preliminarily and permanently enjoin Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them from engaging in the unlawful practices set forth in this Complaint;

g. Award Plaintiffs damages, including treble damages, and equitable relief, including restitution and disgorgement, in an amount subject to proof at trial;

h. Award Plaintiffs' counsel costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

i. Order pre-judgment and post-judgment interest as provided by law; and

j. Provide such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 23, 2023                          Respectfully submitted,

**DONATI LAW, PLLC**

/s/Bryce W. Ashby
Bryce W. Ashby (TN Bar No. 026179)
Donati Law, PLLC
1545 Union Ave.
Memphis, TN 38104
(901) 278-1004
bryce@donatilaw.com


**TOWARDS JUSTICE**

Juno Turner (pro hac vice motion
forthcoming)
David H. Seligman (pro hac vice
motion forthcoming)
Rachel W. Dempsey (pro hac vice motion
forthcoming)
Towards Justice
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
rachel@towardsjustice.org


**NICHOLS KASTER, PLLP**

Anna P. Prakash (she/her), MN Bar No.
0351362
(*pro hac vice* application forthcoming)
Joshua Cottle (he/him), NY Bar No.
5914676
(*pro hac vice* application forthcoming)
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
aprakash@nka.com
jcottle@nka.com


*Attorneys for Plaintiff and the Proposed*
*Class and Collective*

27