IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| NATHAN FUCHS *et al.*, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No. 3:23-cv-00892 |
| SPECIALTYCARE, INC., | ) CHIEF JUDGE CAMPBELL ) MAGISTRATE JUDGE HOLMES |
| Defendant. | ) ) |

## MEMORANDUM

Pending before the Court is Defendant SpecialtyCare, Inc.'s ("SpecialtyCare") Partial Motion to Dismiss ("Motion") (Doc. No. 134). Plaintiffs Nathan Fuchs ("Fuchs") and Caitlin Bailey ("Bailey," collectively "Plaintiffs") filed a response in opposition ("Opposition") (Doc. No. 140).[1] For the reasons set forth below, the Motion is **GRANTED** in part and **DENIED** in part.

### I. FACTUAL AND PROCEDURAL BACKGROUND

SpecialtyCare employs surgical neurophysiologists ("SNs") to provide intraoperative neuromonitoring services, which involve observing patients during surgery and alerting doctors to symptoms of abnormal brain and nerve functioning. (Doc. No. 122 ¶¶ 1–2). Named Plaintiffs Fuchs and Bailey are former SpecialtyCare employees who bring this collective and putative class action against SpecialtyCare on behalf of themselves and other SNs employed by SpecialtyCare. (*Id.* ¶¶ 13–14, 135–45). Plaintiffs bring claims against SpecialtyCare for kickback of wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216 (Count I), wages not paid

---

[1] SpecialtyCare did not file a reply.

free and clear in violation of the FLSA (Count II), violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.* (Count III, in the alternative to Counts I and II), unlawful restraint of trade (Count IV), and unlawful liquidated-damages provision (Count V).

Plaintiffs allege that entry-level SNs join SpecialtyCare through a year-long training program which includes in-person and online coursework, laboratory practicums, and practical training in the operating room. (*Id.* ¶¶ 3, 32). Plaintiffs also allege that, in exchange for the training, SNs are required to sign a Training Repayment Agreement ("the Repayment Agreement") promising to reimburse SpecialtyCare for the cost of their training if they leave their jobs within three years. (*Id.* ¶¶ 5, 62). Plaintiffs state that although the training is completed within one year, the Repayment Agreement debt continues to grow for two more years and "amounts to an interest rate of approximately 25% on the principal cost of the training for an employee who resigns within one to two years of starting work" and "an interest rate of approximately 50% for an employee who resigns within two to three years of starting work." (*Id.* 40 ¶ 65). Plaintiffs state that the debt is forgiven after 3 years of employment with SpecialtyCare. (*Id.* ¶ 66).

Plaintiffs allege that Fuchs was employed as an SN at SpecialtyCare from September 2020 until February 2022 and that, after Fuchs resigned, SpecialtyCare informed him that he owed $25,000 for his SN training, which is more than the $1,347.50 he received for 40 hours of work during his final work week. (*Id.* ¶¶ 107, 123–24, 134–35). Fuchs hired a lawyer, who negotiated with SpecialtyCare a $15,000 repayment for the debt in exchange for a release from any claims related to his employment. (*Id.* ¶¶ 130–31).

Plaintiffs further allege that Bailey was employed by SpecialtyCare as SN from August 2022 to March 2024 and that, after Bailey resigned, SpecialtyCare sent her a letter requesting

2

repayment of $30,145.59 for the training she received and relocation expenses,[2] which is more than the $1,273.05 SpecialtyCare paid her for 40 hours of work during her final pay period. (*Id.* ¶¶ 14, 78, 101–105). Plaintiffs allege that Bailey has not received additional communications from SpecialtyCare about the debt. (*Id.* ¶ 106).

On March 20, 2023, SpecialtyCare filed a motion to dismiss Plaintiffs' Amended Complaint ("FAC") (Doc. No. 40), which the Court granted in part and denied in part. (*See generally* Doc. No. 68). Specifically, the Court dismissed the FMLA claim as to Fuchs for failure to allege that he was paid less than minimum wage. (*See* Doc. No. 68 at 6). The Court also dismissed the TILA claim as time barred. (*See id.* at 9). The court denied the motion to dismiss in all other aspects. (*See generally id.*). On August 1, 2024, Plaintiffs filed a Second Amended Complaint ("SAC").[3] (Doc. No. 98). On November 22, 2024, Plaintiffs filed their Third Amended Complaint ("TAC"), which substitutes a former plaintiff with Bailey but is otherwise nearly identical to the SAC. (*See generally* Doc. No. 122; *see also* Doc. No. 119-3 (redline comparing the SAC and the TAC)). On December 6, 2024, Plaintiffs filed their Motion under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (*See generally* Doc. No. 134).

---

[2] The alleged breakdown is $25,000 for the training and $5,145.59 for relocation expenses. (See id. ¶ 102).

[3] The SAC essentially added allegations regarding wages (*see* Doc. No. 98 ¶¶ 102–05; 134–35), that the Repayment Agreement is an education loan (*see id.* ¶ 167), and that SpecialtyCare is a lender (*see id.* ¶ 168).

3

## II. STANDARD OF REVIEW

### A. Fed. R. Civ. P. 12(b)(1)

Whether a court has subject-matter jurisdiction is a "threshold determination" in any action. *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). This reflects the fundamental principle that "[j]urisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). The party asserting subject-matter jurisdiction bears the burden of establishing that it exists. *Ammons v. Ally Fin., Inc.*, 305 F. Supp. 3d 818, 820 (M.D. Tenn. 2018).

A motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction "can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 759 (6th Cir. 2014) (internal citation omitted). A facial attack challenges the sufficiency of the pleading and, like a motion under Rule 12(b)(6), requires the Court to take all factual allegations in the pleading as true. *Wayside Church v. Van Buren Cty.*, 847 F.3d 812, 816-17 (6th Cir. 2017) (citing *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)).

A factual attack challenges the allegations supporting jurisdiction, raising "a factual controversy requiring the district court to 'weigh the conflicting evidence to arrive at the factual predicate that subject matter does or does not exist.'" *Id.* at 817 (quoting *Gentek*, 491 F.3d at 330). When analyzing a factual attack as to standing, the court may undertake "a factual inquiry regarding the complaint's allegations only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Gentek*, 491 F.3d at 330. District courts reviewing

4

factual attacks have "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.3d 320, 325 (6th Cir. 1990).

### B. Fed. R. Civ. P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for failure to state a claim upon which relief can be granted. For purposes of a motion to dismiss, a court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id.* at 678. A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Thus, dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Guzman v. U.S. Dep't of Children's Servs.*, 679 F.3d 425, 429 (6th Cir. 2012).[4]

---

[4] Generally, a court cannot consider matters outside the pleadings in a Rule 12(b)(6) motion. However, "courts may consider documents attached to a Rule 12(b)(6) or 12(c) motion without converting either into a summary judgment motion if the attached materials are: (i) 'referred to in the plaintiff's complaint and are central to [the] claims' or (ii) 'matters of public record.'" *Kassam v. Ocwen Loan Servicing, LLC*, 704 F. App'x 429, 432 (6th Cir. 2017) (internal citations omitted). Here, the Repayment Agreement (Doc. No. 135-2) is central to the claims at issue. Accordingly, the Court considers the Repayment Agreement in its ruling on SpecialtyCare's Motion.

## III. ANALYSIS

### A. FLSA (Counts I and II)

1. Bailey

SpecialtyCare argues that the Court should dismiss Bailey's FLSA claim for lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6). (*See* Doc. No. 135 at 9–15). The Court is "bound to consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if this court lacks subject matter jurisdiction." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (citing *Bell v. Hood*, 327 U.S. 678, 681 (1946)); *see Damnjanovic v. United States Dep't of Air Force*, 135 F. Supp. 3d 601, 604 (E.D. Mich. 2015); Wright & Miller, *5 Federal Practice and Procedure* § 1350 at 548 (1969).

SpecialtyCare's jurisdictional argument is based on ripeness. (See Doc. No. 135 at 9–12).

> "The jurisdiction of federal courts is limited by Article III of the Constitution to 'Cases' and 'Controversies.' U.S. Const. art. III, § 2. The standing doctrine delineates the boundary between justiciable cases and controversies and those disputes that are not appropriately resolved through judicial process. Although 'the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III,' the Supreme Court has recognized that 'some of [the standing doctrine's] elements express merely prudential considerations that are part of judicial self-government.' *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The ripeness doctrine is one of several justiciability doctrines 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.' *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n. 18 (1993). The 'basic rationale' of ripeness doctrine 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . and also to protect . . . from judicial interference until a[ ] . . . decision has been formalized and its effects felt in a concrete way by the challenging parties.' *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967). In addition, '[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.' *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted).
> [. . . ]
> A plaintiff must demonstrate that he has standing to pursue his claim in federal court by showing three elements: (1) that he has suffered an "injury in fact," (2) that there is a "causal connection between the injury and the conduct complained of," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (internal citations and quotation marks omitted).

6

> [. . .]
> A plaintiff suffers an 'injury in fact' when his legally protected interest has been invaded and the injury is both 'concrete and particularized' and 'actual or imminent, not 'conjectural' or 'hypothetical.'' *Lujan*, 504 U.S. at 560 (citations omitted)

*Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014).

Here, SpecialtyCare argues Bailey's claim is not ripe because SpecialtyCare did not collect money from her, did not threated litigation, and did not refer her to collections. (*See* Doc. No. 135 at 9–12). Persuasive authority supports SpecialtyCare's argument, inasmuch as courts have found that plaintiffs suffered no injury in fact under similar circumstances. *See, e.g.*, *O'Brien v. Smoothstack, Inc.*, No. 1:23-CV-491 (RDA/LRV), 2025 WL 1921433, at *7 (E.D. Va. July 11, 2025) (in a factually analogous FLSA case, no injury in fact where the plaintiffs "never actually returned any wages, made any payment to Defendant, or had any wages deducted upon leaving his employment"); *Byron v. Avant Healthcare Pros., LLC*, No. 6:23-CV-1645-JSS-LHP, 2024 WL 3738488, at *8 (M.D. Fla. Aug. 9, 2024) ("Plaintiffs do not allege that Defendant actually collected any money damages from Plaintiffs, just that Defendant threatened to do so by enforcing the damages provision of its form contract [. . . .] Because Plaintiffs' FLSA claims depend upon Defendant's enforcement of the damages provision against Plaintiffs, which involves contingent future events that may not occur as anticipated, or indeed may not occur at all, the FLSA claims are not ripe." (quotation marks omitted)); *Bland v. Edward D. Jones & Co., L.P.*, 375 F. Supp. 3d 962, 974 (N.D. Ill. 2019) (allegations that the defendants sent letters demanding payment pursuant to a similar contract were insufficient to establish an injury in fact, including for declaratory relief, where "Plaintiffs have not alleged any facts suggesting that Defendants have (1) taken any steps to bring litigation against them, (2) ever actually collected money from individuals pursuant to the TCR Provision, or (3) even expressly threatened to file suit."); *Bland v. Edward D. Jones & Co., L.P.*, No. 18-CV-1832, 2020 WL 1503574, at *6 (N.D. Ill. Mar. 30, 2020) (same); *cf. Ketner v.*

7

*Branch Banking & Tr. Co.*, 143 F. Supp. 3d 370, 383 (M.D.N.C. 2015) (finding an injury in fact where, among other things, the employer hired a law firm that sent multiple collection letters to the plaintiff and threatened legal action, and where the employer recovered money from other employees).

In response, Plaintiffs rely on a case in which the Sixth Circuit found that a written policy requiring alleged kickbacks to the employer upon termination violated the plaintiffs' FLSA rights, despite the absence of actual attempts to collect by the employer, because the policy subjected them to liability. *See Stein v. HHGREGG, Inc.*, 873 F.3d 523 at 535–36 (6th Cir. 2017). As a rebuttal of the dissent's argument that the employer did not violate the plaintiff's rights under the FLSA because "the company never actually collected . . . after an employee was terminated," the majority noted:

> Even if defendants never demanded repayment in practice, an employee *may* believe he owes a debt to the company for which he *could* be made responsible at a later date. Incurring a debt, or even believing that one has incurred a debt, has far-reaching practical implications for individuals. It *could* affect the way an individual saves money or applies for loans. An individual *might* feel obligated to report that debt when filling out job applications, credit applications, court documents, or other financial records that require self-reporting of existing liabilities. We therefore believe that focusing on the actual written policy in this case is more practical and realistic than considering only how the policy assertedly is implemented. Plaintiffs have alleged sufficient facts to support a claim that defendants' policy, as written, violates the FLSA by continuing to hold employees liable for draw payments [*i.e.*, wages advanced to employees when their commission fell below minimum wage] even after termination.

*Id.* at 535 (quotation marks omitted) (emphasis added).

SpecialtyCare distinguishes *Stein* on the basis that the opinion was decided under Rule 12(b)(6), meaning that it "contains no analysis of or even references to subject matter jurisdiction, Rule 12(b)(1), standing, or ripeness." (Doc. No. 135 at 12). At least one other court has found that *Stein*'s reasoning does not establish an injury in fact for standing purposes. *See O'Brien*, 2025 WL 1921433 at *8. The Court agrees that *Stein* is not controlling because it does not address

jurisdiction but rather the failure to state a claim under Rule 12(b)(6). The Sixth Circuit's use of the verbs "may," "could" and "might" supports the argument that it did not intend this rationale apply to jurisdictional inquiries.

The Court finds that Bailey did not suffer an injury in fact. Indeed, SpecialtyCare never collected from him; nor does the TAC allege that it threated litigation or took other steps towards collection other than sending a single letter to Bailey after she resigned "confirming receipt of her resignation and informing her that she owed the company $25,000 for failure to complete the [training] and an additional $5,145.59 in relocation assistance." (Doc. No. 122 ¶ 102). In the absence of further actions by SpecialtyCare, Bailey's claim is speculative and conjectural, insofar as it is based on a fear that SpecialtyCare may seek to collect, which may or may not occur. As such, Bailey's claim is not ripe.

Accordingly, the Court will grant SpecialtyCare's Motion on Bailey's FLSA claims.

2. Fuchs

The FLSA requires that employers pay employees hourly minimum wage. *In re: Amazon.Com, Inc. Fulfillment Ctr. Fair Lab. Standards Act (FLSA) and Wage and Hour Litig.*, 905 F.3d 387, 405 (6th Cir. 2018) (internal citation omitted). To prevail on a FLSA claim, a plaintiff must prove that an employer-employee relationship existed, the employee's acts are within the coverage of the FLSA, and the employer failed to pay minimum wage for the acts. *Simpson v. Baskin*, No. 3:17-CV-01077, 2018 WL 1070897, at *4 (M.D. Tenn. Feb. 26, 2018).

Here, Plaintiffs claim that SpecialtyCare engaged in an "illegal kickback" and failed to pay wages "free and clear" in violation of the FLSA. (See Doc. No. 135 ¶¶ 21–23). Plaintiffs' rely on a Department of Labor regulation that requires wages to be paid "free and clear," which may not occur if an employee "'kicks-back' directly or indirectly to the employer or to another person for

9

Case 3:23-cv-00892    Document 189    Filed 08/15/25    Page 9 of 18 PageID #: 7238

the employer's benefit the whole or part of the wage delivered to the employee" such that the employee receives less than the minimum wage during a workweek. 29 C.F.R. § 531.35. To succeed under this theory, Plaintiffs must allege a minimum wage violation. *See Stein*, 873 F.3d at 530–34; *see also Teoba v. Trugreen Landcare LLC*, 769 F. Supp. 2d 175, 180 (W.D.N.Y. 2011) ("minimum wage must be paid free and clear of any deductions or kickbacks to the employer" (emphasis added)).

In its Memorandum Opinion on the Motion to Dismiss the FAC, the Court found that Plaintiffs failed to allege that Fuchs was paid less than minimum wage during his employment with SpecialtyCare and therefore dismissed the FMLA claims as to him. (*See* Doc. No. 68 at 6). Plaintiffs have since added allegations that Fuchs "was paid $1,347.50 for 40 hours worked" during his final work week, which was less than the repayment amount SpecialtyCare demanded. (Doc. No. 122 ¶¶ 133–134). Plaintiffs argue that they only need to identify one work week during which they were paid below minimum wage. (*See* Doc. No. 140 at 10–11). The Court agrees that identifying one work week is enough. *See In re: Amazon.Com, Inc.*, 905 F.3d at 394 ("under federal law, Plaintiffs would be required to identify a particular workweek in which, taking the average rate, they received less than the minimum wage per hour"); *see also Bland*, 375 F. Supp. 3d at 979 (a plaintiff must allege facts showing that the "hourly wages fell below the statutory minimum wage for at least one period").

However, Plaintiffs' new allegations are insufficient to cure the FAC's deficiencies because the TAC does still not plausibly allege that Fuchs received less than the minimum wage for a specific work week. Indeed, in a conclusory manner, Plaintiffs attempt to tie the agreed-upon payment of $15,000 to SpecialtyCare in 2023 to Fuchs' final pay period in February of 2022. (*See* Doc. No. 122 ¶¶ 123–134). However, the release resulting from that payment expressly described

in the TAC connects Fuchs' payment of $15,000 to his "alleged obligation to reimburse [SpecialtyCare] for training expenses pursuant to the Associate Repayment Agreement between Fuchs and [SpecialtyCare] entered into effective September 29, 2020." (Doc. No. 187-1).[5] The release cited by Plaintiffs contradicts Plaintiffs' attempt to tie the $15,000 paid by Fuchs to his last work week because that payment was for "training expenses" over the approximately 18 months he worked for SpecialtyCare. Indeed, Plaintiffs argue only by inference concerning the last work week position because the TAC does not expressly allege that the $15,000 was tied only to the last work week. This is probably due to the fact that Fuchs' release contradicts the suggestion—and only a suggestion—in the TAC concerning how the $15,000 should be applied.

The TAC also expressly alleges that the $15,000 were a reimbursement for Fuchs' training, which lasted from November 9, 2020, to February 2022. (*See* Doc. No. 122 ¶¶ 111, 123, 124–131). Assuming that the $15,000 payment was a kickback, it flows from logic that none of Fuchs' wages were "free and clear" before the end of his third year of employment. (*See Id.* ¶ 6 (the amount to be repaid increases until a SN's third year and is discharged at the end of that year); *see generally* Doc. No. 135-2 (Repayment Agreement)). Because Fuchs worked for SpecialtyCare for less than

---

[5] The Court may consider the release without converting the Motion into a motion summary judgment. *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir.2008) (*citing Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir.2001) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."); *Hall v. Meisner*, 565 F. Supp. 3d 953, 965 (E.D. Mich. 2021), *aff'd*, 51 F.4th 185 (6th Cir. 2022) ("In ruling on a motion to dismiss, the Court may consider the complaint as well as: (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims; (2) matters of which a court may take judicial notice; (3) documents that are a matter of public record [. . . .]" (citing *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015)); *Com. Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007). Moreover, the contents of the release trump conflicting allegations in the TAC. *See QQC, Inc. v. Hewlett-Packard Co.*, 258 F. Supp. 2d 718, 721 (E.D. Mich. 2003) (where the claims rely on the existence of a written agreement, the defendant may introduce such agreement, which is then considered part of the pleadings.); *Perkins v. Hininger*, No. 3:21-CV-00901, 2023 WL 4687196, at *6 (M.D. Tenn. July 21, 2023) (the contents of such written agreement trump the complaint's allegations) (citing *Creelgroup, Inc. v. NGS Am., Inc.*, 518 F. App'x 343, 347 (6th Cir. 2013)).

11

three years, the $15,000 payment was tied to all the wages he received during his employment as described in the release. In other words, because all wages Fuchs received were subject to the alleged kickback, his total weekly compensation amounted to his wages for that week, minus a prorated amount of the $15,000. *See In re: Amazon.Com*, 905 F.3d at 406 ("the minimum wage requirement is generally met when an employee's *total compensation for the week* divided by the total number of hours worked equals or exceeds the required hourly minimum wage" (quoting *Stein*, 873 F.3d at 537)).[6] As such, Plaintiffs cannot selectively deduct the $15,000 from his final paycheck rather than prorate this amount to account for all the paychecks that Fuchs received.[7]

The TAC alleges that Fuchs was paid well over minimum wage during his final work week (*see id.* ¶ 133). There are also no allegations from which the Court could infer that, without deducting $15,000 from one specific paycheck, his income ever dipped below minimum wage. Accordingly, the Court finds that the TAC still fails to state a FLSA claim.

For the above reasons, the FLSA claims will be dismissed under Rule 12(b)(6).

### B. TILA (Count III)

In its Memorandum Opinion on the Motion to Dismiss the FAC, the Court dismissed Plaintiffs' TILA claims as time-barred because the FAC presented those claims as involving "consumer credits," meaning that TILA's one-year statute of limitations applied. (*See* Doc. No. 68

---

[6] The Repayment Agreement contains incremental increases, meaning that the portion of Fuchs' paychecks allegedly subject to kickbacks changed over time. (*See* Doc. No. ¶ 6). But because Fuchs subsequently negotiated a flat payment of $15,000 as satisfaction for the entire debt, prorating this amount is the appropriate calculation method.

[7] Plaintiffs cite two cases in which the court appears to have simply deducted the alleged kickbacks from the plaintiffs' last paycheck. *See Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2023 WL 5104066, at *15 (S.D. Ohio Aug. 9, 2023); *Fredericks v. Ameriflight*, LLC, No. 3:23-CV-1757-X, 2024 WL 1183075, at *5 (N.D. Tex. Mar. 19, 2024). These cases are not binding on the Court, and the Court finds them unpersuasive and factually distinguishable.

at 8–9). SpecialtyCare argues that the TAC's TILA claim remains time-barred if it is a consumer claim. (*See* Doc. No. 135 at 22–24). The Court agrees. For reasons explained in Memorandum Opinion on the Motion to Dismiss the FAC, any claim based on a consumer theory is time-barred.

However, the TAC sets forth an alternative TILA theory based on "private education loans":

> If the training and TRAP debt were primarily for Plaintiff Bailey's benefit, the reimbursement obligation loan included in the Associate Repayment Agreement is a private education loan within the meaning of 15 U.S.C. § 1650(a)(8) and Regulation Z § 1026.46(b)(5), because it is issued expressly for the postsecondary educational expenses incurred from SpecialtyCare's postsecondary training program; is not made, insured, or guaranteed under title IV of the Higher Education Act of 1965; does not include open-end credit or any loan secured by a property or dwelling; and has a term of more than 90 days.
>
> If the training and TRAP debt were primarily for Plaintiff Bailey's benefit, SpecialtyCare is a private educational lender under 15 U.S.C. § 1650(a)(7) because it is engaged in the business of soliciting, making, or extending private education loans. A private education loan is a type of consumer credit.

(Doc. No. 122 ¶¶ 166–67).

SpecialtyCare argues that this alternative TILA claim fails as a matter of law because the TAC's allegations are "conflicting, conclusory, and only masquerading as factual." (*See* Doc. No. 135 at 17). Specifically, SpecialtyCare argues that the TAC does not allege "facts sufficient to satisfy the applicable definitions for a TILA claim based on a private education loan." (*Id.*). SpecialtyCare also argues that the TAC fails to allege that SpecialtyCare is a creditor under TILA. (See *id.* at 24–25). The Court will address these arguments in turn.

1. <u>Plaintiffs May Plead Inconsistent Claims in the Alternative</u>

SpecialtyCare does not explain why the TILA allegations are "conflicting." (*See generally* Doc. No. 135). As the Court understands it, SpecialtyCare's implied argument is that the TILA claim conflicts with the FLSA claims and/or with allegations pertaining to "consumer credits." However, Plaintiffs are allowed to plead in the alternative. *See* Fed. R. Civ. P. 8; *see Kolstad v.*

13

*Leehar Distributors, LLC*, No. 3:18-CV-00060, 2018 WL 6832086, at *8 (M.D. Tenn. Dec. 28, 2018) ("there is no basis to require Plaintiff to choose between conflicting theories at [the pleading] stage"); *see also Indep. Enters. Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997) (Rule 8 "permits inconsistency in both legal and factual allegations"). The TAC expressly states that it pleads the TILA claim in the alternative to the FLSA claims and that the private-education-loan theory is an alternative to the consumer-credit theory. As such, the Court will not dismiss the TILA claim on the basis that it is conflicting.

2. The TAC's Allegations Meet TILA's and Regulation Z's Definitions

SpecialtyCare argues that the TAC's allegations are insufficient to meet various definitions under TILA a Regulation Z. Specifically, SpecialtyCare argues that the allegations are insufficient to show that the Repayment Agreement is a "private education loan" from a "covered educational institution" that pertains to a "cost of attendance." (See Doc. No. 135 at 17–22). For the reasons below, the Court disagrees.

a. TILA

In relevant part, TILA defines "covered educational institution as "any educational institution that offers a postsecondary educational degree, certificate, or program of study (including any institution of higher education)." 15 U.S.C. § 1650(a)(2). TILA further defines a "private education loan" as "a loan provided by a private educational lender that [. . .] is issued expressly for postsecondary educational expenses to a borrower [. . . .]." 15 U.S.C. § 1650(a)(8). "[T]he term 'private educational lender' means," [among other things] "any . . . person engaged in the business of soliciting, making, or extending private education loans." 15 U.S.C. § 1650(a)(7) "[T]he term 'postsecondary educational expenses' means any of the expenses that are included as part of the cost of attendance of a student[.]" 15 U.S.C. § 1650(a)(5). "'[C]ost of attendance' means

[among other things] tuition and fees [. . .] books, course materials, supplies, and equipment [. . .] transportation, personal [and living] expenses, [and] for a student in a program requiring professional licensure, certification, or a first professional credential, the cost of obtaining the license, certification, or a first professional credential." 20 U.S.C. § 1087ll(a).

Based on the above definitions, SpecialtyCare argues that Bailey's TILA claim is deficient because the TAC does not allege that she was a "student," that SpecialtyCare engages in making private education loans, or that the Repayment Agreement was for "cost[s] of attendance." (*See* Doc. No. 135 at 9). The Court disagrees. Indeed, taking the allegations in the TAC as true and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs plausibly allege that Bailey was both a student and an employee of SpecialtyCare, that SpecialtyCare engages in extending loans to SNs such as Bailey, and that these loans are for post-secondary private education, *i.e.*, training to become a SN. *See Heder v. City of Two Rivers, Wisconsin*, 295 F.3d 777, 782 (7th Cir. 2002) (equating the cost of training to a loan because the training benefitted the employee); *Gordon v. City of Oakland*, 627 F.3d 1092, 1096 (9th Cir. 2010) (same); *Milford v. Roehl Transp.*, Inc, No. 22-CV-0879-BHL, 2023 WL 2503495, at *4 (E.D. Wis. Mar. 14, 2023) (same); *Bland v. Edward D. Jones & Co., L.P.*, 375 F. Supp. 3d 962, 978 (N.D. Ill. 2019) (same).

  b. <u>Regulation Z</u>

SpecialtyCare also argues that the TAC does not allege sufficient facts to meet Regulation Z's definition of "private education loan" because SpecialtyCare does not fall within one of three statutory categories of "covered educational institution[s]." (*See* Doc. No. 135 at 20–22). In response, Plaintiffs argue that the TAC pleads facts sufficient to show that SpecialtyCare is a "proprietary institution of higher education," which is a "covered educational institution." (*See* Doc. No. 17–19). The Court agrees with Plaintiffs.

15

Regulation Z provides that a "private education loan" is "for postsecondary educational expenses." 12 C.F.R. § 1026.46(b)(5). "Postsecondary educational expenses means any of the expenses that are listed as part of the cost of attendance [. . .] of a student at a covered educational institution." 12 C.F.R. § 1026.46(b)(3). "Institution of higher education has the same meaning as in [the Higher Education Act of 1965 ("HEA")]. 12 C.F.R. § 1026.46(b)(2). The HEA's definitions of "institution of higher education" include "a proprietary institution of higher education." 20 U.S.C. § 1002(a)(1)(A). In relevant part, a "proprietary institution of higher education" means a school that (i) "provides an eligible program of training to prepare students for gainful employment in a recognized occupation"; (ii) "admits as regular students only persons having a certificate of graduation from a school providing secondary education, or the recognized equivalent of such a certificate [plus exceptions]"; (iii) is legally authorized within [a state] to provide a program of education beyond secondary education"; and (iv) "has been in existence for at least 2 years." 20 U.S.C. §§ 1001(a)(1)–(2), 1002 (b)(1).[8]

Here, the TAC alleges that SpecialtyCare trains incoming SNs in a "job-training program" called "SpecialtyCare University." (Doc. No. 122 ¶ 3). The TAC also at least implies that SpecialtyCare operates its training program for profit because as it alleges that the Repayment Agreement's liquidated damages exceed the value of the training. *(See, e.g. id.* ¶¶ 7–9). The TAC further describes the training program as "postsecondary," thereby implying that SNs must have completed secondary education prior to starting the program. (*See id.* ¶ 166). Furthermore, the TAC alleges that SNs can receive a Certification in Neurophysiologic Intraoperative Monitoring from the American Board of Registration of Electroencephalographic and Evoked Potential Technologists for their training through SpecialtyCare, which leads to the inference that being a

---

8     Accreditation is not a requirement. *See* 12 C.F.R. § 1026.46 (b)(1)(i).

SN is a recognized occupation. (*See id.* ¶¶ 27–61). The Court also easily infers that SpecialtyCare has been in existence for more than two years because the TAC uses the present tense when referring to SpecialtyCare's training program—as of November 22, 2024, the filing date—and alleges that Bailey and Fuchs started the program over two years prior. (*See id.* ¶¶ 32–61, 78, 166). Finally, while the TAC does not allege that SpecialtyCare University is authorized by State law to provide post-secondary education, Tennessee law expressly forbids the operation of such program without State authorization. (*See* Tenn. Code Ann. § 49-7-2007). The TAC alleges that SpecialtyCare operates a training facility in Nashville, Tennessee. (See Doc. No. 166 ¶ 41). For purposes of ruling on the present Motion, the Court finds it reasonable to infer that SpecialtyCare's training is authorized by the State because it would otherwise be operating in violation of Tennessee law. Should discovery show otherwise, SpecialtyCare can move for summary judgment.

For these reasons, the Court rejects SpecialtyCare's argument that the TAC does not allege sufficient facts to meet Regulation Z's definition of "private education loan."

3. The TAC Alleges SpecialtyCare Is a Creditor Under TILA

SpecialtyCare argues that the TAC "does not sufficiently allege that SPecialtyCare is a creditor under TILA" because it "does not allege any facts supporting a plausible inference that the Repayment Agreement contained a finance charge." (Doc. No. 135 at 24). Specifically, SpecialtyCare argues that the TAC does not allege that "SpecialtyCare charged [Bailey] a higher reimbursement cost for the privilege of extending the reimbursement payment over time" or that the parties agreed "to a different price for Bailey's right to defer payment." (*Id.* at 25). Plaintiffs counter that the Repayment Agreement contains a finance charge because the amount owed to

17

SpecialtyCare "continues to grow after the education for which it purports to reimburse SpecialtyCare is complete." (Doc. No. 140 at 20). The Court agrees with Plaintiffs.

In relevant part, TILA defines a creditor as:

> a person who both (1) regularly extends [. . .] consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of the indebtedness [. . . .]

15 U.S.C. § 1602. The TILA further defines a "finance charge" as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). The statute expressly states that a "time price differential, and any amount payable under a point, discount, or other system of additional charges" is a "finance charge." (*Id.*)

Here, the TAC alleges that the Repayment Agreement subjects Bailey to a debt which incrementally increases over time. (*See* Doc. No. 122 ¶¶ 6). It further alleges that "interest . . . accrues at a rate of nearly 30% annually even after the training is complete". (*Id.* ¶ 9). The Court finds that this is enough to meet the above statutory definition of a "finance charge." As such, the Court rejects SpecialtyCare's argument.

## IV.  CONCLUSION

For the reasons stated, SpecialtyCare's Partial Motion to Dismiss (Doc. No. 134) will be **GRANTED** in part and **DENIED** in part. The Motion will be **GANTED** on Counts I and II and **DENIED** on Count III.

An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE